# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

## CIVIL ACTION FILE NO. 1:05-CV-01209-CC

## S. GREGORY HAYS, AS CHAPTER 11 TRUSTEE AND LIQUIDATING AGENT FOR FILM FABRICATORS, INC.,

**Appellant,**

**v.**

## TSG VENTURES, INC., OPPORTUNITY CAPITAL CORPORATION, OPPORTUNITY CAPITAL PARTNERS II, L.P., and OPPORTUNITY CAPITAL PARTNERS III, L.P.

**Appellees.**

## APPEAL FROM A DECISION OF THE UNITED STATES BANKRUPTCY COURT NORTHERN DISTRICT OF GEORGIA

## <u>BRIEF OF APPELLANT</u>

J. Michael Lamberth
Georgia Bar No. 431975
William D. Matthews
Georgia Bar No. 470865
Lamberth, Cifelli, Stokes & Stout, PA
3343 Peachtree Road, N.E.
East Tower, Suite 550
Atlanta, Georgia 30326
(404) 262-7373 (telephone)
(404) 262-9911 (facsimile)
Attorneys for the Appellant

170220

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

I.    STATEMENT OF JURISDICTION ...................................................................................... 1

II.   STATEMENT OF ISSUES ................................................................................................. 1

III.  STANDARD OF REVIEW ................................................................................................. 2

IV.   STATEMENT OF THE CASE ............................................................................................ 2

   A.   Course of Proceedings and Disposition Below ............................................................ 2

   B.   Statement of Facts ........................................................................................................ 6

V.    ARGUMENT AND CITATION OF AUTHORITY .......................................................... 19

   a.   The Bankruptcy Court Erred in Disregarding the Res Judicata Effect of the Order

Confirming the Plan. ........................................................................................................ 19

   b.   The Bankruptcy Court Erred in Failing to Subordinate the Claims of Appellees Pursuant

to the Enforceable Subordination Agreements Executed by Appellees. ................................ 28

   c.   The Bankruptcy Court Erred in Refusing to Allow First Union to Give Up Its Distribution

in Favor of a Class of Other Creditors. ............................................................................. 38

   d.   The Bankruptcy Court Erred in Indicating that Wrongful Conduct by Appellees Would be

Necessary in Order to Separately Classify and Subordinate the Appellees' Claims. ............... 41

   e.   The Bankruptcy Court Erred in Indicating that the Appellees Would Have Been Entitled

to a Distribution if this Bankruptcy Case Had Been Converted to Chapter 7. ........................ 43

   f.   The Bankruptcy Court Erred in "Re-Characterizing" the Settlement With First Union to

Treat First Union as Fully Paid. ....................................................................................... 45

VI.   CONCLUSION ............................................................................................................. 48

170220

# TABLE OF AUTHORITIES

## Cases

Allied Pilots Association v. Pension Benefit Guaranty Corp., 334 F.3d 93, 97 (D.C. Cir. 2003) 21

Ernst & Young LLP v. Baker O'Neal Holdings, Inc., 304 F.3d 753, 755 (7th Cir. 2002) ............ 21

Great Lakes Higher Educ. Corp. v. Pardee (In re Pardee), 193 F.3d 1083, 1086 (9th Cir.1999) . 25

In re American Preferred Prescription, Inc., 255 F.3d 87, 92 (2nd Cir. 2001) .............................. 21

In re Bateman, 331 F.3d 821, 830 (11th Cir. 2003) ........................................................................ 22

In re Best Products Co., Inc., 168 B.R. 35 (Bankr. S.D.N.Y.), appeal dismissed as moot, 177

B.R. 791 (S.D.N.Y. 1995), rev'd as to mootness issue and upholding decision of the

bankruptcy court, 68 F.3d 26 (2nd Cir. 1995)........................................................................ 36, 37

In re Chattanooga Wholesale Antiques, Inc., 930 F.2d 458, 463 (6th Cir. 1991) ......................... 20

In re Chicago, South Shore and South Bend Railroad, 146 B.R. 421 (Bankr. N.D.Ill. 1992)30, 31,

32, 33, 34

In re Dial Business Forms, Inc., 341 F.3d 738, 744 (8th Cir. 2003).............................................. 20

In re Genesis Health Ventures, Inc., 266 B.R. 591 (Bankr.D.Del.2001) ................................. 40, 41

In re Greate Bay Hotel & Casino, Inc., 251 B.R. 213 (Bankr. D.N.J. 2000).................... 34, 35, 36

In re Justice Oaks II Limited, 898 F.2d 1544 (11th Cir. 1990), cert. denied, 498 U.S. 959, 111

S.Ct. 387, 112 L.Ed.2d 398 (1990) ...................................................................................... 22

In re Optical Technologies, Inc., 246 F.3d 1332, 1334-35 (11th Cir. 2001) .................................. 2

In re PWS Holding Corp., 228 F.3d 224 (3rd Cir. 2000)............................................................... 36

In re PWS Holding Corp., 303 F.3d 308 (3rd Cir. 2002)............................................................... 20

170220

In re Shank, 315 B.R. 799, 807 (Bankr. N.D. Ga. 2004) ................................................................ 22

In re Southeast Banking Corp., 156 F.3d 1114, 1121 (11th Cir. 1998) ............................. 28, 43, 44

In re Varat Enterprises, Inc., 81 F.3d 1310, 1317 (4th Cir. 1996) ............................................ 21, 25

In re Walnut Equipment Leasing Co., Inc., 1999 WL 1068448 (Bankr. E.D.Pa. 1999) .............. 37

In re Worldcom, Inc., 2003 WL 23861928 (Bankr. S.D.N.Y. 2003) ............................... 39, 40, 41

Miller v. United States, 363 F.3d 999 (9th Cir. 2004) ........................................................... 19, 20

Official Comm. of Unsecured Creditors v. Stern (In re SPM Mfg. Corp.), 984 F.2d 1305, 1313

   (1st Cir.1993) ............................................................................................... 40, 41, 48

Raleigh v. Illinois Dept. of Revenue, 530 U.S. 15, 24-25, 120 S.Ct. 1951, 1958 (2000) ............. 48

## Statutes

11 U.S.C. §105(a) ................................................................................................. 41, 48

11 U.S.C. §1121(c) .................................................................................................... 2, 22

11 U.S.C. §1123(a)(1) ................................................................................................ 2, 23

11 U.S.C. §1123(a)(3) ................................................................................................ 3, 23

11 U.S.C. §1123(b)(3) ............................................................................................... 2, 22

11 U.S.C. §1141(a) ......................................................................................................... 19

11 U.S.C. §510(c) ........................................................................................................... 42

28 U.S.C. § 1334 ............................................................................................................... 1

28 U.S.C. § 158(a) ............................................................................................................ 1

170220

## I.    STATEMENT OF JURISDICTION

This Court has jurisdiction of this appeal because it is a direct appeal from a final judgment of the United States Bankruptcy Court for the Northern District of Georgia.  Subject matter jurisdiction arises under 28 U.S.C. § 1334, which confers to the federal courts original jurisdiction over Title 11 cases.  Appellate jurisdiction is conferred by 28 U.S.C. § 158(a), which permits a district court to review all final decisions, judgments, orders, and decrees entered by the bankruptcy courts.

## II.    STATEMENT OF ISSUES

1.    Whether the Bankruptcy Court erred in entering judgment in favor of Plaintiffs and against Defendants.

2    Whether the Bankruptcy Court erred in granting Plaintiffs' Motion for Summary Judgment.

3.    Whether the Bankruptcy Court erred in denying Defendants' Cross Motion for Summary Judgment.

4.    Whether the Bankruptcy Court erred in refusing to enforce the applicable provisions of the confirmed plan.

5.    Whether the Bankruptcy Court erred in refusing to enforce the applicable subordination provisions.

170220

### III.    STANDARD OF REVIEW

This is an appeal from a grant of summary judgment and the denial of a cross-motion for summary judgment.  The standard of review is entirely *de novo*.  In re Optical Technologies, Inc., 246 F.3d 1332, 1334-35 (11th Cir. 2001).

### IV.    STATEMENT OF THE CASE

**A.    Course of Proceedings and Disposition Below**

In the bankruptcy case of Film Fabricators, Inc. ("Debtor" or "Film Fabricators" or "Company"), the Chapter 11 Trustee and the Official Committee of Creditors proposed a plan of liquidation (Appellate Record, Tab No. 181) as authorized by 11 U.S.C. §1121(c).  As permitted by 11 U.S.C. §1123(b)(3), the plan provided for the settlement of a claim with the Debtor's main secured creditor, First Union Commercial Corporation ("First Union").   The Plan specifically stipulated that First Union would have an unsecured deficiency claim in the amount of $1,890,073.37.  Pursuant to the settlement proposed in the Plan, First Union agreed that any and all distribution amounts payable to or on account of its deficiency claim would be "transferred and assigned to and for the benefit of the Holders of Class 3 Unsecured Claims, other than First Union, and all such distribution amounts shall be distributed and paid to the Holders of Class 3 Unsecured Claims, other than First Union."  As required by 11 U.S.C. §1123(a)(1)

2                                                        170220

and (3), the Plan designated classes of claims and interests and specified the treatment of impaired classes of claims.  The Plan specifically created a separate class (Class 5) consisting of entities (including the Appellees herein) who were the holders of certain Subordinated Notes, and the Plan specifically provided that the holders of such Subordinated Notes "shall not be paid or receive any property on account of such Claims."  These Subordinated Notes were issued and sold by the Debtor to entities willing to make such an "investment" in "Securities" as those terms are defined in the Note and Warrant Purchase Agreement relating to the Subordinated Notes.  As signatories to the Note and Warrant Purchase Agreement, the Purchasers of such Notes (including Appellees) contractually agreed that they would receive no payment from the liquidation of the Debtor's assets in bankruptcy until "all Senior [First Union] Debt shall first be fully, finally, and irrevocably paid in full…."  Section 10.3 of Note and Warrant Purchase Agreement (Exhibit A of Complaint, Appellate Record [hereinafter "R."] Tab No. 1).  The Plan proposed to enforce this subordination provision and to pay holders of Subordinated Notes nothing on their claims, since First Union would have a deficiency claim that would not be paid in full, and the distribution amounts payable on account of the deficiency claim were assigned to the holders of Class 3 unsecured claims.  The Plan did permit holders of Subordinated Notes an

170220

opportunity to contest the enforceability of any subordination agreement by instituting an adversary proceeding against the Trustee by a specific deadline. R. Tab No. 181, Article III, Section C, Class 5.

Appellees did not object to the confirmation of the Plan. The Bankruptcy Court overruled objections (raised by entities other than Appellees) to confirmation in an Order (R. Tab No. 212), and confirmed the Plan in a separate Order ("Confirmation Order," R. Tab No. 211) entered February 14, 2003. The Appellees did institute an adversary proceeding against the Trustee (who became the Liquidating Agent under the Plan) prior to the deadline stated in the Plan to institute an adversary proceeding "to contest the enforceability of the Subordination Agreement."

Even though the Bankruptcy Court did not conclude that the Subordination Agreement was unenforceable and, notwithstanding the terms of the confirmed Plan, the Bankruptcy Court entered Judgment (R. Tab No. 49) in favor of Appellees (the Holders of Subordinated Notes) on March 25, 2005, and ordered that Appellees' Claims (previously classified as Class 5 Subordinated Claims) be classified instead as Class 3 Unsecured Claims. In reaching this conclusion, the Bankruptcy Court (at the hearing held March 23, 2005) ruled that holders of Subordinated Notes should receive the same treatment as other Unsecured Claims

170220

based on the conclusion that First Union had effectively been paid in full.  At the hearing on March 23, 2005, the Bankruptcy Court indicated: "So the economic substance is – then I'm ruling they're paid.  They're paid."  Transcript of March 23, 2005 Hearing (hereinafter "Transcript") at p. 22, lines 5-6.  The Court went on to state: "I don't think in economic substance that they [First Union] have a deficiency.  I think they're fully paid."  Transcript at p. 23, line 25 to p. 24 line 1.  The Court concluded: "I'm saying as a matter of law on the summary judgment that -- under the circumstances of this case that they have been fully paid, and so since they have been fully paid, there's no reason that TSG ought to be set in a classification by itself, and the Court's order is that they be included in class three and get a pro rata distribution."  Transcript at p. 24, lines 16-21.

Appellant (hereinafter, the "Liquidating Agent") shows that the Bankruptcy Court's conclusion that Appellees are entitled to any distribution as Class 3 claimants and the conclusion that First Union should be treated as being paid in full are in error and contrary to precedent that a confirmed plan binds all creditors and has res judicata effect.  Further, the Bankruptcy Court's holding is contrary to Eleventh Circuit precedent indicating that subordination agreements are enforceable in bankruptcy cases.

5

170220

**B.    Statement of Facts**

Film Fabricators is a Georgia Corporation which was headquartered in Norcross, Georgia.    The company engaged in the manufacturing of flexible packaging film.  See Disclosure Statement dated December 3, 2002 ("Disclosure Statement", R. Tab No. 182) at Part V, p. 8.  First Union Commercial Corporation ("First Union") was the Company's secured lender pursuant to a $4,250,000 Revolving Credit Loan and Security Agreement ("Revolver") and a $16,450,000 Term Loan Agreement ("Term Loan"), both dated September 30, 1996 and both of which were integrated, cross-defaulted and cross-collateralized by a first lien security interest in substantially all of the real and personal property of the Debtor. Disclosure Statement (R. Tab No. 182) at Part V, p. 9.

On or about September 30, 1996, Film Fabricators and the Appellees herein (TSG Ventures, Inc., Opportunity Capital Corporation, Opportunity Capital Partners II, L.P., Opportunity Capital Partners III, L.P., and Renaissance Capital Corporation) entered into a Note and Warrant Purchase Agreement, pursuant to which TSG purchased Senior Subordinated Notes in the stated principal amount of $3,000,000 and the Opportunity Capital entities collectively purchased Senior Subordinated Notes in the stated principal amount of $700,000.  Complaint at Paragraph 7 (R. Tab No. 1).  The Note and Warrant Purchase Agreement dated as

170220

of September 30, 1996 (Exhibit "A" to the Complaint, R. Tab No. 1) makes it clear that Film Fabricators was selling the Subordinated Notes and common stock warrants in order to finance the purchase by Film Fabricators of the assets of another company:

> WHEREAS, the Company [Film Fabricators] has entered into an Asset Purchase Agreement dated April 17, 1996, with Southern Bag Corporation, Ltd. (the "Seller"), as amended as of May 24, 1996 (as so amended, the "Asset Purchase Agreement");
>
> WHEREAS, pursuant to the Asset Purchase Agreement, the Company as agreed to purchase (the "Asset Purchase") all the assets of Seller for the consideration set forth therein (the "Purchase Price");
>
> . . .
>
> WHEREAS, the Company desires that the Purchasers purchase $4,000,000 principal amount of 11.5% Senior Subordinated Notes of the Company, the proceeds of which, **together with other financing**, will be used to fund the Purchase Price, refinance existing debt of the Company and provide the Company with working capital…

Note and Warrant Purchase Agreement at p. 1 (emphasis added).

Section 2.1 of the Note and Warrant Purchase Agreement provides that the Company shall issue and sell the Subordinated Notes and Warrants and further provides that the Notes and Warrants "shall individually be referred to herein as a "Security" and collectively referred to herein as the "Securities." Under Section 4.10 of the Note and Warrant Purchase Agreement, the Company warrants that it

7

170220

was selling the Securities (the Notes and Warrants) under an exemption of the Securities Act.

Under Section 5.2 of the Note and Warrant Purchase Agreement, each purchaser of the Subordinated Notes warrants that it is an "accredited investor" familiar with "**investments**" in securities such as the Subordinated Notes:

> Each purchaser (i) is knowledgeable, sophisticated and experienced in business and financial matters; (ii) **previously invested in securities similar to the Securities** and it acknowledges that the Securities have not been registered under the Securities Act and understands that the Securities must be held indefinitely unless they are subsequently registered under the Securities Act or such sale is permitted pursuant to an available exemption from such registration requirement; (iii) is able to bear the economic risk of its **investment in the Securities** and is presently able to afford the complete loss of such investment; (iv) is an "accredited investor" as defined in Regulation D promulgated under the Securities Act; and (v) has been afforded access to information about the Company and the Company's financial condition, results of operations, business, property, management and prospects sufficient to enable it to evaluate its **investment in the Securities**. Each Purchaser acknowledges that it has conducted its own analysis of the Company's financial condition and other foregoing factors and that such Purchaser has not relied upon the analysis of any other Purchaser in determining to make an **investment in the Securities**.

Note and Warrant Purchase Agreement at Section 5.02 (emphasis added).

Finally, Article X of the Note and Warrant Purchase Agreement included subordination provisions. Section 10.3 of the Note and Warrant Purchase Agreement provides:

8                                    170220

Subordination on Dissolution, Liquidation or Reorganization of the Company.    (a) Upon any payment or distribution of cash, securities or other property of the Company of any kind or character to creditors upon any dissolution, winding up, total or partial liquidation, reorganization or marshaling of assets of the Company, whether voluntary or involuntary, or in bankruptcy, insolvency, receivership proceedings or upon assignment to the benefit of creditors, all Senior Debt [i.e. obligations owing to First Union] shall first be fully, finally and irrevocably paid in full in cash or U.S. Government Obligations before any Holder [of a Subordinated Note] may receive or retain any payment or Distribution of Assets (other than Other Subordinated Securities so paid or distributed in respect of the Senior Subordinated Debt).

Note and Warrant Purchase Agreement (Ex. A to R. Tab No. 1) at Section 10.3.

Film Fabricators filed its Chapter 11 petition on November 19, 2001. The United States Trustee filed on December 21, 2001 its Notice appointing the Official Committee of Unsecured Creditors (the "Committee"). The Committee filed its Emergency Motion to Appoint Trustee on February 8, 2002. The Bankruptcy Court entered its Order on March 4, 2002 granting the Motion to Appoint a Chapter 11 Trustee. The United States Trustee entered on March 8, 2002 its Notice of Appointment of S. Gregory Hays as Chapter 11 Trustee. The Bankruptcy Court entered on March 14, 2002 its Order Approving the Appointment of S. Gregory Hays as Chapter 11 Trustee. The Committee, the Trustee, and First Union engaged in lengthy negotiations regarding the amount, validity, extent, perfection, and/or avoidability of First Union's liens and claims

9

against the Debtor and the assets of the Debtor and the Estate.  Several extensions were obtained with regard to the time in which the Trustee or Committee could timely contest the validity, extent, perfection, priority and/or avoidability of First Union's liens and claims, which last extension was through and until February 28, 2003, a date after confirmation.  R. Tab No. 209.

On December 9, 2002, the Trustee and the Committee filed a First Amended Plan of Liquidation (the "Plan," R. Tab No. 181) and a First Amended Disclosure Statement (the "Disclosure Statement," R. Tab No. 182) regarding the Plan.  Part IV of the Disclosure Statement (Summary of Plan) describes the Plan's reliance on a settlement with First Union:

> The Plan provides for the orderly liquidation and windup of the Debtor's assets and affairs.  The Plan provides mechanisms for the liquidation or other disposition of remaining assets, **the approval and consummation of a compromise settlement with and release of First Union** (hereafter defined), the prosecution of litigation that may yield additional funds for the estate, the division of creditors' and shareholders' interests into classes, and distribution of remaining liquidation proceeds, litigation recoveries, and other assets to holders of Allowed Claims in a manner consistent with the requirements of the Bankruptcy Code

Disclosure Statement (R. Tab No. 182) at Part IV.

The settlement with First Union is described in more detail in  Article IV, Section I of the Plan at p. 19 as follows:

10

170220

A.      First Union Settlement.  The cornerstone of the Plan is compromise settlement between the Trustee, the Committee, the Estate and First Union involving the following components:

1.    **The terms and provisions of the Subordination Agreements shall be enforced and shall remain in full force and effect and enforceable in accordance with their terms**.  First Union's sole responsibility for enforcement of the Subordination Agreements is not to waive or release any of its rights under the Subordination Agreements and to provide truthful factual evidence with respect thereto in the Bankruptcy Court upon proper subpoena by the Proponents or any holder of a Subordinated Claim.  Except as herein expressly provided, First Union shall have no obligation to enforce the Subordination Agreements or to incur any expense in aiding the Proponents to enforce the Subordination Agreements.  Upon Confirmation, First Union shall be entitled to all benefits of the First Union Settlement as long as First Union performs its obligations herein identified even if some or all of the Subordination Agreement are ultimately held to be unenforceable in whole or in part.  **Pursuant to the terms of the Subordination Agreements, all Distribution amounts otherwise due to Holders of Claims that are subordinated under the Subordination Agreements shall be distributable to First Union until sufficient Distribution amounts would be available to satisfy in full the First Union Deficiency Claim**.

2.    **All Distribution amounts payable to or on account of the First Union Deficiency Claim and the Subordinated Claims, are transferred and assigned to and for the benefit of the Holders of Unsecured Claims, other than First Union, and all such Distribution amounts shall be distributed and paid to the Holders of Unsecured Claims, other than First Union.**

3.    First Union is granted a full and complete release of any and all Causes of Action that the Debtor, the Trustee, the Committee or Liquidating Agent, or anyone asserting a cause of action

11                                                         170220

through or on behalf of them, may have against First Union, whether arising prior to or after the Filing Date and whether sounding in contract or tort or arising under any of the provisions of the Bankruptcy Code (including, without limitation, §§ 105, 506(c), 544, 546-50 or 553) and that Confirmation shall constitute a determination by the Bankruptcy Court that First Union's liens and security interests are valid, enforceable, perfected and unavoidable, that the First Union Secured Claim is an Allowed Claim as provided in the Plan, and **that the First Union Deficiency Claim is a liquidated, undisputed and non-contingent Allowed Claim**, in consideration of:

(a) Payment on the Effective Date by First Union to the Trustee for the benefit of the Estate of $115,000.00 ("First Union Settlement Payment");

(b) The release, by First Union of any lien or security interest claim in or against the Assets, including the cash held or disbursed by the Trustee at any time prior to the Effective Date;

(c) **The transfer and assignment by First Union of the Distribution amounts payable to or on account of the First Union Deficiency Claim and the Subordinated Claims to and for the benefit of the Holders of Allowed Unsecured Claims, other than First Union**; and

(d) The full and complete release of any and all Causes of Action that First Union may have against the Debtor, the Estate, the Trustee, the Committee, or Liquidating Agent, whether arising prior to or after the Filing Date and whether sounding in contract or tort, except as provided in this Plan.

4. The releases provided for in Article IV.I and the transfer and assignment provided for in Article IV.I shall be effective as of the

12

170220

> Effective Date and shall not extend to or cover claims or
> obligations that are preserved or created under the Plan, including,
> but not limited to, the Deficiency Claim of First Union, which is
> treated as provided in the Plan.

Plan (R. Tab No. 181), Article IV, Section I at p. 19 (emphasis added).

The Disclosure Statement further described in Part VII how the Plan would classify and treat various claims. Specifically, the Disclosure Statement indicated: (a) that the Plan called for the enforcement of subordination agreements; (b) that the Plan separately classified the claims of holders of Subordinated Notes and called for such claims to receive no payment; (c) that the Plan separately classified other Unsecured Claims (specifically including First Union's Deficiency Claim) and called for the payment of such claims from a Distribution Fund; (d) that the Plan provided that First Union would transfer and assign to the Class 3 Unsecured Claims all distribution amounts payable on account of First Union's Deficiency Claim; and (e) that the Plan permitted the holder of a Subordinated Note to file an adversary proceeding no later than thirty days after confirmation of the Plan in order to contest the enforceability of a Subordination Agreement. Specifically, Section VII of the Disclosure Statement provides:

**B.    Classification and Treatment of Claims.**

> 3.    <u>Class 3 (Unsecured Claims)</u>. Class 3 consists of all Allowed
> Claims which are not Administrative Claims, Priority Tax
> Claims, Other Priority Claims, Fines, Penalties and Punitive

170220

Damages Claims, the First Union Secured Claim, or Subordinated Claims. **This Class includes the First Union Deficiency Claim**. The Unsecured Claims will be paid by distributions from the Distribution Fund as described in Section E below.

. . .

5.      Class 5 (Subordinated Claims). **The Holders of Subordinated Claims shall not be paid or receive any property on account of such Claims**. <u>**The Holder of a Claim that is subject to any of the Subordination Agreements described or identified in (a)-(r) of the definition of Subordination Agreements in Article I of the Plan may contest the enforceability of the Subordination Agreement by instituting an adversary proceeding against the Trustee/Liquidating Agent within thirty (30) days of the Confirmation Date**</u>. With regard to each Subordination Agreement described or identified in (a)-(r) of the definition of Subordination Agreements in Article I of the Plan which is not timely challenged as provided herein, entry of the Confirmation Order shall constitute a conclusive determination that such Subordination Agreement is enforceable and that any Claim that is subject to any such Subordination Agreement is conclusively determined to be a Claim falling within Class 5. Any Subordinated Claim as to which a timely adversary proceeding is commenced shall be deemed a Disputed Claim.

. . .

8.      <u>Enforcement of Subordination Agreements and Provision Regarding Distributions on Account of First Union Deficiency Claim</u>. The terms and provisions of the Subordination Agreements shall be enforced and shall remain in full force and effect and enforceable in accordance with their terms. First Union's sole responsibility for enforcement of the Subordination Agreements is not to waive or release any of its rights under the Subordination Agreements and to provide

14

truthful factual evidence with respect thereto in the Bankruptcy Court upon proper subpoena by the Proponents or any holder of a Subordinated Claim.  Except as herein expressly provided, First Union shall have no obligation to enforce the Subordination Agreements or to incur any expense in aiding the Proponents to enforce the Subordination Agreements.  Upon Confirmation, First Union shall be entitled to all benefits of the First Union Settlement as long as First Union performs its obligations herein identified even if some or all of the Subordination Agreement are ultimately held to be unenforceable in whole or in part.  **Pursuant to the terms of the Subordination Agreements, all distribution amounts otherwise due to Holders of Claims that are subordinated under the Subordination Agreements shall be distributable to First Union until sufficient distributions amounts would be available to satisfy in full the First Union Deficiency Claim**.

9.     <u>Transfer and Assignment of Distributions on Account of First Union Deficiency Claim</u>.  **All distribution amounts payable to or on account of the First Union Deficiency Claim, including those distribution amounts that would flow to the First Union Deficiency Claim on account of the Subordination Agreements, are transferred and assigned to and for the benefit of the Holders of Class 3 Unsecured Claims, other than First Union, and all such distribution amounts shall be distributed and paid to the Holders of Class 3 Unsecured Claims, other than First Union**.

Disclosure Statement (R. Tab No. 182) at Part VII (emphasis added).

Part X of the Disclosure Statement provides an estimate of the amounts of unsecured claims and an estimate of the distribution to be made in connection with unsecured claims.  Part X of the Disclosure Statement also makes it clear that the distribution percentage to be paid to Unsecured Claims was dependent upon

170220

whether or not any holder of Subordinated Notes was able to successfully argue

that their subordination agreements were not enforceable.  Specifically, Part X of

the Disclosure Statement provides:

**C.**    **Estimated Amounts of Unsecured Claims.**

The general unsecured claims can be viewed as having three components.  One is the **First Union Deficiency Claim which is stipulated under the Plan to be $1,890,073.37**.  A second component is the Subordinated Claims, debt subordinated to First Union, which is estimated to be $12,112,247.00.  The third component is the other unsecured debt, which is estimated to be $4,900,000.00.  **But for the First Union Settlement, distributions on account of the First Union Deficiency Claim and on account of the Subordinated Claims, would be payable to First Union**.

The First Union Deficiency Claim and the Subordinated Claims to First Union will not participate in any distribution to the other general unsecured creditors since **any amount otherwise distributable to First Union on the First Union Deficiency Claim and the Subordinated Claims (estimated to be more than $430,200) is transferred and assigned for the benefit of the other general unsecured creditors**, as provided in Article IX. I and J of the Plan.  Consequently, the entire estimated distributable amount of $580,000.00 will be distributed to and for the benefit of these other general unsecured claims which are estimated by Proponents to be in the total amount of $4,900,000.00.

**D.**    **Estimated Distributions.**

The estimated distribution to the Class of Unsecured Claims is 12.0 percent, which excludes participation by First Union on account of the First Union Deficiency Claim.  Without the First Union Settlement, the unsecured claims could expect a distribution of approximately 3%.  **First Union, the Trustee and the Committee believe that the Subordination Agreements are enforceable, but no assurance of**

170220

**such enforceability is given and First Union has no obligation to incur any expense to enforce the Subordination Agreement or any of them.  To the extent any of the Subordination Agreements are determined to be unenforceable, the distribution to the Class of Unsecured Claims will be less than 12%.**

Disclosure Statement (R. Tab No. 182) at Part X (emphasis added).

TSG and the other Appellees did not object to confirmation of the Plan.  The Confirmation Order (R. Tab No. 211) was entered on February 14, 2003.

On March 14, 2003, TSG and the other Appellees filed their Complaint (R. Tab No. 1) against the Liquidating Agent initiating Adversary Proceeding No. 03-9082 in the Bankruptcy Court.  Paragraph 11 of the Complaint alleges that the action is filed pursuant to the provisions of the Plan permitting holders of Subordinated Notes to "challenge the enforceability of the Note and Warrant Purchase Agreement by instituting an adversary proceeding against [the Liquidating Agent] within thirty (30) days of the entry of the Confirmation Order." TSG and the other Appellees filed their Motion for Summary Judgment (R. Tab No. 25) in the adversary proceeding on April 27, 2004.  The  Liquidating Agent filed his Cross-Motion for Summary Judgment (R. Tab No. 26) on May 20, 2004.

The Bankruptcy Court conducted a hearing on  the motions for summary judgment on November 10, 2004.  On March 23, 2005, the Bankruptcy Court held a hearing at which the Court issued its ruling on the motions for summary

17

judgment.   At the hearing, the Court did not conclude that the subordination provisions of the Note and Warrant Purchase Agreement were unenforceable. Instead, the Bankruptcy Court ruled that First Union had been paid in full and that holders of Subordinated Notes should  therefore be entitled to participate in a distribution and to receive the same treatment as other Unsecured Claims.   The Court concluded: "I'm saying as a matter of law on the summary judgment that -- under the circumstances of this case that they have been fully paid, and so since they have been fully paid, there's no reason that TSG ought to be set in a classification by itself, and the Court's order is that they be included in class three and get a pro rata distribution."   Transcript at p. 24, lines 16-21.   Based upon this oral ruling, the Court, on March 25, 2005, entered Orders denying the Defendants' motion for summary judgment (R. Tab No. 48) and granting the Plaintiffs' motion for summary judgment (R. Tab No. 47).   Also on March 25, 2005, the Bankruptcy Court entered a Judgment (R. Tab No. 49) in favor of Plaintiffs, which Judgment ordered that Appellees' Claims (previously classified as Class 5 Subordinated Claims) be classified instead as Class 3 Unsecured Claims.  The Liquidating Agent filed a timely Notice of Appeal (R. Tab No. 55) from these Orders and the Judgment.

170220

## V.    ARGUMENT AND CITATION OF AUTHORITY

a.    The Bankruptcy Court Erred in Disregarding the Res Judicata Effect of the Order Confirming the Plan.

In the adversary proceeding, the Appellees in essence objected to the treatment or classification of their claims under the Plan.  Such arguments were barred because they could have been raised as an objection to confirmation of the plan.[1]  The Confirmation Order (R. Tab No. 211) is res judicata with respect to such issues.  By confirming the Plan, the Bankruptcy Court necessarily adjudicated that the classification of Appellees' claims was proper and that the proposed treatment of the claims was not unfair.

Section 1141(a) of the Bankruptcy Code provides: "… the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan."  11 U.S.C. §1141(a).

In Miller v. United States, 363 F.3d 999 (9th Cir. 2004), the Court stated:

---

[1] Even if the arguments had been made at the confirmation stage, the arguments would have lacked any merit, as the cases cited in part b of this Brief demonstrate.

> [A]n order confirming a bankruptcy plan is "binding on all parties and all questions that could have been raised pertaining to the plan are entitled to *res judicata* effect." Trulis v. Barton, 107 F.3d 685, 691 (9th Cir.1995). **"If a creditor fails to protect its interests by timely objecting to a plan or appealing the confirmation order," the creditor is foreclosed from challenging any of the plan's provisions, "*even if such a provision is inconsistent with the Code*."** Great Lakes Higher Educ. Corp. v. Pardee (In re Pardee), 193 F.3d 1083, 1086 (9th Cir.1999) (internal quotation marks omitted).

Miller v. United States, 363 F.3d 999, 1004 (9th Cir. 2004) (emphasis added). See also In re Chattanooga Wholesale Antiques, Inc., 930 F.2d 458, 463 (6th Cir. 1991) ("Confirmation of a plan of reorganization by the bankruptcy court has the effect of a judgment by the district court and res judicata principles bar relitigation of any issues raised or that could have been raised in the confirmation proceedings."); In re Dial Business Forms, Inc., 341 F.3d 738, 744 (8th Cir. 2003) ("A confirmed Chapter 11 plan not only "acts like a contract that binds the parties," . . . [i]t is also an order of the bankruptcy court."); In re PWS Holding Corp., 303 F.3d 308, 315-316 (3rd Cir. 2002) (holding that creditor who had the opportunity to contest language in the debtor's proposed Chapter 11 plan, which provided for extinguishment of any fraudulent transfer claims that the trustee or any other party might have asserted on the creditors' behalf was barred by the confirmed plan from later seeking to prosecute fraudulent transfer claims in state court), cert. denied, Haskell v. PWS Holding Corp., 538 U.S. 924 (2002); Ernst & Young LLP v. Baker

170220

O'Neal Holdings, Inc., 304 F.3d 753, 755 (7th Cir. 2002) ("A confirmed plan of reorganization is in effect a contract between the parties and the terms of the plan describe their rights and obligations."); In re American Preferred Prescription, Inc., 255 F.3d 87, 92 (2nd Cir. 2001) ("The confirmation of a plan in a Chapter 11 proceeding is an event comparable to the entry of a final judgment in an ordinary civil litigation."); In re Varat Enterprises, Inc., 81 F.3d 1310, 1317 (4th Cir. 1996) ("Once a plan is confirmed, neither a debtor nor a creditor can assert rights that are inconsistent with its provisions.").

In Allied Pilots Association v. Pension Benefit Guaranty Corp., 334 F.3d 93, 97 (D.C. Cir. 2003), the Court held that when the Bankruptcy Court entered an order confirming a Chapter 11 plan that incorporated the terms of comprehensive settlement agreement between the debtor-airline, its employees, and the Pension Benefit Guaranty Corporation (PBGC), and such order included a determination that the PBGC would have sought termination of the debtor-airline's pension plans in the absence of the settlement agreement, such determination was res judicata on that matter and established that, as of the time of the settlement agreement, the PBGC had determined that the statutory requirements for the involuntary termination of the pension plans were met.

21

170220

In In re Justice Oaks II Limited, 898 F.2d 1544 (11th Cir. 1990), cert. denied, 498 U.S. 959, 111 S.Ct. 387, 112 L.Ed.2d 398 (1990), the Eleventh Circuit held that claims raised by guarantors in an adversary proceeding were, or could have been, raised in the guarantors' objection to confirmation of Chapter 11 plan, and thus, doctrine of claim preclusion (or res judicata) barred them from relitigating claims in the adversary proceeding. The Court stated: "While the court's order authorizing settlement cannot be given preclusive effect, we conclude that the order confirming the plan does satisfy the requirements of a judgment that can be given such effect. Furthermore, we hold that the doctrine of 'claim preclusion' applies to bar litigation of the claims made in the Wallises' [the guarantors'] adversary complaint." Id. at 1549-1550. See also In re Bateman, 331 F.3d 821, 830 (11th Cir. 2003) (reiterating the holding in Justice Oaks that confirmation of a plan has res judicata effect in the context of a Chapter 13 plan as well as a Chapter 11 plan); In re Shank, 315 B.R. 799, 807 (Bankr. N.D. Ga. 2004) (discussing Justice Oaks II and noting that "[c]lassification is a confirmation issue, and an objection on that basis obviously must be made prior to confirmation").

In the case at bar, the Chapter 11 Trustee and the Official Committee of Creditors proposed a plan of liquidation as authorized by 11 U.S.C. §1121(c). As permitted by 11 U.S.C. §1123(b)(3), the "cornerstone" of the Plan was an agreed-

22

170220

upon compromise between the Trustee, the Committee, the Estate, and First Union. Plan, R. Tab No. 181, Article IV, Section I at p. 19. **The Plan specifically stipulated that First Union would have an unsecured deficiency claim in the amount of $1,890,073.37**. Plan, R. Tab No. 181, Article I, Section B at p. 4 (Definition of "First Union Deficiency Claim"). TSG and the other Appellees even stated that First Union had an unsecured deficiency claim in the amount of $1,890,073.37 at Paragraph 13 of their own "Statement of Material Facts as to Which There is No Genuine Issue to be Tried" attached to their Motion for Summary Judgment (R. Tab No. 25). Pursuant to the settlement proposed in the Plan, First Union agreed that any and all distribution amounts payable to or on account of its deficiency claim would be "transferred and assigned to and for the benefit of the Holders of Unsecured Claims, other than First Union, and all such Distribution amounts shall be distributed and paid to the Holders of Unsecured Claims, other than First Union." Plan, R. Tab No. 181, Article IV, Section I, Paragraph 2, p. 19. As required by 11 U.S.C. §1123(a)(1) and (3), the Plan designated classes of claims and interests and specified the treatment of impaired classes of claims. The Plan specifically created a separate class (Class 5) consisting of entities (including the Appellees herein) who were the holders of certain Subordinated Notes (See Plan, Article II Section D, p. 10), and the Plan

23

170220

specifically provided that the holders of such Subordinated Notes "shall not be paid or receive any property on account of such Claims."  Plan, R. Tab No. 181, Article III Section C, p. 12.  This same section of the Plan stated:

> As provided in Article IV, the terms and provisions of the Subordination Agreements shall be enforced and shall remain in full force and effect and enforceable in accordance with their terms. There will be no Distribution to any Holder of a Claim that falls within the scope of Class 5, including, without limitation, any Claim that is subordinated under the Subordination Agreements.

Plan, R. Tab No. 181, Article III Section C, p. 12

With regard to the Appellees, the subordination agreements to be enforced under the terms of the Plan are contained in the Note and Warrant Purchase Agreement signed by the Appellees, which provided that the Purchasers of such Subordinated Notes (including Appellees) would receive no payment from the liquidation of the Debtor's assets in bankruptcy until "all Senior [First Union] Debt shall first be fully, finally, and irrevocably paid in full…."  Section 10.3 of Note and Warrant Purchase Agreement (Exhibit A to R. Tab No. 1).

In summary, the Plan included: (a) provisions calling for the enforcement of subordination agreements; (b) provisions that separately classified the claims of holders of Subordinated Notes; (c) provisions that indicated that the separately classified claims of the holders of Subordinated Notes would receive no payment; (d) provisions that separately classified other Unsecured Claims (and specifically

24

including First Union's Deficiency Claim); (e) *provisions specifically stipulating and setting forth the amount of First Union's Deficiency Claim*; (f) provisions that indicated that the separately classified Unsecured Claims would be paid from a Distribution Fund; and (g) provisions incorporating a settlement calling for First Union to transfer and assign to the Class 3 Unsecured Claims all distribution amounts payable on account of First Union's Deficiency Claim.

The Confirmation Order has res judicata effect with regard to all of the issues listed in the previous paragraph of this brief, and Appellees are precluded from relitigating any of these issues and are precluded from asserting any rights that are inconsistent with these provisions of the confirmed plan. See, e.g., In re Varat Enterprises, Inc., 81 F.3d 1310, 1317 (4th Cir. 1996). Further, the Appellees would be foreclosed from challenging any of the provisions of the confirmed plan "*even if such a provision is inconsistent with the Code*." Great Lakes Higher Educ. Corp. v. Pardee (In re Pardee), 193 F.3d 1083, 1086 (9th Cir.1999).

Here, the Bankruptcy Court improperly concluded, without any basis in law, that First Union had been paid in full and that the Appellees were therefore entitled to participate in the distribution as general unsecured creditors. The doctrine of res judicata bars this conclusion since: the confirmed Plan specifically provided that First Union had a Deficiency Claim in the amount of $1,890,073.37; and the

25

Confirmation Order provided "that the First Union Deficiency Claim is a liquidated, undisputed and non-contingent Allowed Claim."  R. Tab No. 211, at p. 3.

Under the provisions of the confirmed Plan,  Appellees were barred from asserting that they were entitled to *any* distribution *unless* Appellees successfully contested the *enforceability* of the subordination provisions of the Note and Warrant Purchase Agreement.  Except for a successful contest as to *enforceability*, the Plan clearly called for Appellees to receive no distribution on account of their claims arising from the Subordinated Notes.  The Plan provided (in Article III, Section C, Class 5):

> To the extent that a Subordination Agreement is determined not to be enforceable as to a Claim and such Claim is not otherwise subject to subordination, such Claim shall be a Class 3 Unsecured Claim, and that Claim will receive treatment as provided in the Plan for that Class.

> The Holders of Subordinated Claims shall not be paid or receive any property on account of such Claims.  The Holder of a Claim that is subject to any of the Subordination Agreements described or identified in (a)-(r) of the definition of Subordination Agreements in Article I hereof may contest the enforceability of the Subordination Agreement by instituting an adversary proceeding against the Trustee/Liquidating Agent within thirty (30) days of the Confirmation Date.  With regard to each Subordination Agreement described or identified in (a)-(r) of the definition of Subordination Agreements in Article I hereof which is not timely challenged as provided herein, entry of the Confirmation Order shall constitute a conclusive determination that such Subordination Agreement is

170220

enforceable and that any Claim that is subject to any such Subordination Agreement is conclusively determined to be a Claim falling within Class 5. Any Subordinated Claim as to which a timely adversary proceeding is commenced shall be deemed a Disputed Claim.

Plan, R. Tab No. 181, Article III, Section C, Class 5, at pp. 12-13.

Thus, the Plan permitted subordinated creditors such as Appellees to institute an adversary proceeding *solely* to contest the enforceability of a particular subordination agreement. The Bankruptcy Court did not rule that the subordination provisions of the Note and Warrant Purchase Agreement were unenforceable. Instead, the Court found (improperly) that First Union had been paid in full and that the subordination provisions therefore no longer operated so as to preclude Appellees from receiving payment on their claims as holders of Subordinated Notes. Such a holding was contrary to the provisions of the confirmed Plan and the Confirmation Order.

The arguments raised by Appellees in the Bankruptcy Court (and effectively accepted by the Bankruptcy Court) relate *solely* to the Plan's classification and treatment of Appellees' subordinated claims and to the Plan's provisions calling for the enforcement of the Subordination Agreements. After entry of the Confirmation Order, the exclusive option was to contest the enforceability of the subordination agreements. If a subordinated creditor wished to contest the

27

<u>treatment</u> of its claim as proposed by the Plan or if a subordinated creditor wished to contest the <u>classification</u> of its claim, then the subordinated creditor could have raised such issues as part of an objection to confirmation.  The Confirmation Order (R. Tab No. 211) operates to bar the litigation of such issues.

Appellees sought in the adversary to challenge the classification or treatment of their claims under the Plan. The res judicata effect of the Confirmation Order (R. Tab No. 211) precludes the Appellees from asserting that the Plan's classification or treatment of their claims was improper.  It was error for the Bankruptcy Court to deny the Liquidating Agent's motion for summary judgment and it was error for the Court to enter a Judgment (R. Tab No. 49) in favor of Appellees, which Judgment ordered that Appellees' claims, previously classified as Class 5 Subordinated Claims, be classified as a Class 3 Unsecured Claims.

b.    <u>The Bankruptcy Court Erred in Failing to Subordinate the Claims of Appellees Pursuant to the Enforceable Subordination Agreements Executed by Appellees</u>.

The law in the 11th Circuit regarding subordination agreements is: Subordination Agreements are enforceable in bankruptcy to the same extent that such agreements are enforceable under applicable non-bankruptcy law. <u>In re Southeast Banking Corp.</u>, 156 F.3d 1114, 1121 (11th Cir. 1998).  Contractual

170220

subordination is enforceable in bankruptcy as a matter of statute.   11 U.S.C. Section 510(a).

In the case at bar, the Appellees contractually agreed that they would receive no payment from the liquidation of the Debtor's assets in bankruptcy until "all Senior [First Union] Debt shall first be fully, finally, and irrevocably paid in full…." Note and Warrant Purchase Agreement (Ex. A to R. Tab No. 1) at Section 10.3.   The Bankruptcy Court erred in failing to give effect to this enforceable subordination provision and ruling that Appellees are entitled to participate in a distribution and receive payment even though it is undisputed that the First Union debt has not been and will never be paid in full.   In other words, the Bankruptcy Court's ruling will allow TSG and the other Appellees to receive payment under circumstances where they contractually agreed in advance that they would not be entitled to payment. TSG and the other Appellees would receive a windfall under this ruling.

As set forth in the previous section of this Brief, the contentions of Appellees in the Court below were basically equivalent to assertions that the Plan either (a) improperly classified their subordinated claims separately from the

170220

claims of other unsecured creditors[2]; or (b) improperly treated their subordinated claims differently from the claims of other unsecured creditors.  Both of these contentions are precluded by the doctrine of res judicata (as set forth above) because they should have been raised as objections to confirmation.  However, even if Appellees were not barred from relitigating these contentions, case law supports the Plan's separate classification and treatment of subordinated claims, because subordination provisions are enforceable in bankruptcy cases.

There is nothing unfair or contrary to policy for a Chapter 11 plan to include provisions calling for a subordinated creditor to receive nothing while a senior creditor assigns part of its claim to other unsecured creditors or in some other way agrees to allow other unsecured creditors to be paid.  TSG and the other Appellees cannot point to a single decision in which such negotiated terms of a Plan were found to be unfair or to make such a Plan unconfirmable.

In the case of In re Chicago, South Shore and South Bend Railroad, 146 B.R. 421 (Bankr. N.D.Ill. 1992), the senior secured lenders were entitled to all of

---

[2] At the hearing, the Bankruptcy Court acknowledged that the issues involved in this matter were really issues of classification and treatment.  The Court stated: "I think that I should've been dealing with this issue over a year ago at the plan confirmation process, because it really is a classification issue and a distribution treatment issue."  Transcript at p. 10, lines 18-21.  Notwithstanding this acknowledgement, the Court failed to enforce the Confirmation Order and its res judicata or claim preclusion effect.

the proceeds of the sale of the Debtor's assets because the assets were sold for less than the amount of the secured claim. Id. at 424. However, under the terms of a confirmed plan, the Lenders agreed to accept a portion (approximately 2/3 of their claim), to allow other funds to be used to pay priority claims, and to allow the remaining funds to be distributed to the Class 4 unsecured creditors, with the proviso that, if all unsecured creditors were paid, then the Lenders had a right to receive an additional distribution. Id. Pursuant to the confirmed plan, the claim of a subordinated creditor was actually classified together with the claims of all other unsecured creditors as a Class 4 claim and was "deemed allowed as a Class 4 unsecured claim." Id. at 425. The trustee accepted an assignment of the secured Lenders' rights under the applicable subordination agreement and waited until after confirmation of the plan to file an "objection" to the subordinated creditor's claim in order to contend that the claim should be subordinated. Id. at 424-25. The Court first discussed the enforceability of the subordination provisions and concluded:

> Because the Subordination Agreement is enforceable under Illinois law and was properly assigned to the Trustee, this Court must enforce it so as to effectuate its terms and the parties' intentions within the context of the Plan without in any way modifying the parties' rights under the Subordination Agreement. 11 U.S.C. § 510(a). The intent of the parties in entering into the Subordination Agreement was to subordinate the debt owed to [the subordinated creditor] to that

31

owed to the Lenders in order to induce the Lenders to extend credit to the Debtor. (Trustee's Statement, Ex. 6).

. . .

Even if [the subordinated creditor] actually received a distribution as an unsecured creditor along with the Lenders and other unsecured creditors on a pro rata basis, the Lenders would have a claim for relief against [the subordinated creditor] under the Subordination Agreement for any payments made to [the subordinated creditor] before the Lenders were paid in full. **The Lenders' right to payment in full before [the subordinated creditor] is no less enforceable by the Trustee in the present situation. In each scenario what is being enforced is the Lenders' right under the Security Agreement to payment in full before [the subordinated creditor] receives any payment--no more, no less**.

Chicago, South Shore and South Bend Railroad, 146 B.R. at 428-429 (emphasis added). The Court concluded that, because the amount on hand in the estate was insufficient to allow the secured Lenders to be paid in full from the total distributions that could have been made to the Lenders, "**therefore [the subordinated creditor] has no right to any distribution that may be made to Class 4 unsecured claimants**." Id. at 429. (emphasis added).

The Court went on to address how this conclusion was in no way unfair to the subordinated creditor:

That Class 4 unsecured claimants other than [the subordinated creditor] will receive a distribution in this case is not unfair to [the subordinated creditor] and does not modify the relationship between the Lenders and [the subordinated creditor] set forth in the Subordination Agreement. **[The subordinated creditor] is getting**

32

170220

> **no less than they bargained for in entering into the Subordination Agreement with the Lenders**.   [The subordinated creditor] clearly intended to subordinate the debt owed to it by the Debtor to the debt owed to the Lenders in order to induce the Lenders to extend credit to the Debtor.   Pursuant to § 510(a) the Subordination Agreement is enforceable in this bankruptcy case because it is enforceable under Illinois law.  **Thus, whether the Debtor is under the protection of the bankruptcy court or not, [the subordinated creditor] is not entitled to collect any part of its debt from the Debtor until the Lenders receive payment in full**.  Had enough money been brought into the Debtor's estate so that in excess of $29,000,000 had been distributed, [the subordinated creditor] would have been in a position to receive a distribution.

Id. at 429 (emphasis added).  The Court also rejected the subordinated creditor's

contention that the senior creditors' claims had been paid in full and satisfied under

the terms of the confirmed plan:

> The Assignment Agreement is not contested.   Instead, [the subordinated creditor] contends the Lenders had nothing to assign because the Plan fully satisfied their secured claims.  This is incorrect. The Lenders' agreement to the terms of the Plan does not change the fact that they have not yet been paid in full on their underlying claim. Confirmation of a plan of reorganization does not extinguish contractual rights negotiated between creditors.  As of confirmation, the Lenders had not been paid in full and, therefore, retained the right to insist that they be paid before [the subordinated creditor] and nothing prevented the assignment of that right.

Id. at 428.  Finally, the Court rejected the subordinated creditor's argument that the

Subordination Agreement was breached by the senior creditor's agreement to

allow a distribution to creditors other than the subordinated creditor: "It is

inconsistent for [the subordinated creditor] to argue that by compromising their

170220

claim to allow some distribution to other creditors the Lenders acted in bad faith or unfairly towards [the subordinated creditor].... This result is no less and no more than [the subordinated creditor] bargained for when it entered into the Subordination Agreement and therefore cannot constitute a breach of good faith and fair dealing." Id. at 430.

In In re Greate Bay Hotel & Casino, Inc., 251 B.R. 213 (Bankr. D.N.J. 2000), the claims against the Debtors included claims (labeled as "Intercompany Note claims") under two Subordinated Promissory Notes, repayment of which was made subordinate by agreement to payment in full of certain "Old Notes." Id. at 218-219. The Court considered whether to confirm a plan which provided that "Intercompany Note claims, other subordinated claims, and Old Common Stock interests, which will be cancelled and extinguished, receive no distribution under the plan...." Id. at 223. The plan actually proposed to allocate a distribution of new stock to the subordinated creditors (the holders of the Class 5 Intercompany Notes), but also proposed that this allocation of stock would actually be distributed to the holders of the senior indebtedness (the holders of the Old Notes) pursuant to applicable subordination agreements. Id. at 225-226. The subordination agreements in question provided that "the holders of the Old Notes 'shall be entitled to receive payment in full of all amounts due ... before Lender is entitled to

34

170220

receive any payment on account of this [Intercompany] Note' and that the Old Noteholders are entitled to receive 'any payment or distribution ... which may be payable or deliverable in respect of this [Intercompany] Note.'" Id. at 226. Thus, the plan called for any distribution that would otherwise be made to the subordinated creditors to instead be paid to the creditor in whose favor the subordination provisions ran. The Court concluded:

> A contractual subordination agreement is enforceable in bankruptcy "to the same extent that such agreement is enforceable under applicable nonbankruptcy law." 11 U.S.C. §§ 510(a). *See In re Southeast Banking Corp.,* 156 F.3d 1114, 1121-22 (11th Cir.1998) (section 510(a) requires subordination agreements to be enforced on par with other nonbankruptcy contracts). Enforcement of the subordination agreement in the context of the … plan mandates that the proposed distribution on account of the Intercompany Notes be added to the distribution to be received by Class 2 Old Noteholders.

Greate Bay Hotel, 251 B.R. at 226. The Court rejected the argument by the subordinated creditor that its claim should have been classified together with the claims of general unsecured creditors: "The Intercompany Notes are not substantially similar to Class 4 general unsecured claims, because no distribution can be received by the Intercompany Noteholders prior to payment in full of the Old Notes…. The classification scheme, treating Class 5 Intercompany notes separately, is proper." Id. Also, the Greate Bay Hotel court rejected an argument by the subordinated noteholder that its treatment amounted to unfair

35

discrimination.  Id. at 232.  The court concluded that the plan in question should be confirmed.  Id. at 249.

Similarly, in In re PWS Holding Corp., 228 F.3d 224 (3rd Cir. 2000), the United States Court of Appeals for the Third Circuit considered an appeal by the holder of subordinated notes (and by the indenture trustee for the subordinated notes) of an order confirming a plan which called for no payment to the holders of subordinated notes.  228 F.3d at 231.  "We reject [the subordinated noteholder's] argument under § 510(a) because the subordinated noteholders' rights under the agreement do not arise until the senior indebtedness has been paid in full, which has not happened under the plan."  Id. at 230.  The Court of Appeals rejected the arguments raised by the appellants and affirmed the order of confirmation.

The decision in In re Best Products Co., Inc., 168 B.R. 35 (Bankr. S.D.N.Y.), appeal dismissed as moot, 177 B.R. 791 (S.D.N.Y. 1995), rev'd as to mootness issue and upholding decision of the bankruptcy court, 68 F.3d 26 (2nd Cir. 1995) also addressed a plan of reorganization which enforced contractual subordination agreements, separately classified the claims of the subordinated noteholders, and provided that the subordinated noteholders would receive no distribution.  "The distributions to which these classes would otherwise be entitled

36

are being 'rolled up' to the creditors in whose favor the subordination agreements

run."  Best Products, 168 B.R. at 47-48.  The Court confirmed the plan and stated:

> Best has met its burden of proving the existence and validity of the subordination agreements.  None of the Objectants quarreled with this....  Nor have the Objectants adduced evidence which would lead me to conclude that the unambiguous agreements should not be enforced according to their terms.  Not that the Objectants haven't had the opportunity.  *See* Tr. at 1528-29.  They chose to forego proving grounds for equitable subordination (which, as I mentioned much earlier in this decision, they specifically said they were not attempting to show) and instead relied on their jurisdictional arguments.
>
> Best's plan of reorganization does nothing more than enforce the unambiguous terms of the contractual subordination agreements in accordance with section 510(a) of the Code and state law contract principles.  Since I have approved a settlement pursuant to which the Banks are left with a claim, the subordination agreements are enforceable.

Best Products, 168 B.R. at 70 (footnotes omitted).  Significantly for the case at bar,

the plan in the Best Products case also included settlement provisions of certain

actions against the senior Banks.  As part of the settlement, "the Banks have agreed

to shift to other classes distributions of roughly $23 million in cash and $8 million

in equity.  The Banks are not releasing or waiving the benefits of any contractual

subordination held by them as against the Objectants."  Id. at 47.  The court

approved the settlement and held that the plan could be confirmed.  Id. at 73.  See

also In re Walnut Equipment Leasing Co., Inc., 1999 WL 1068448 (Bankr. E.D.Pa.

1999) (confirming plan calling for separate classification of the claim held by the

170220

holder of certain subordinated indenture certificates, the enforcement of the subordination provisions, and no payment to the holder of the subordinated claim until prior classes were paid in full).

In summary, undisputed authority establishes that a plan should be confirmed over the objection of a subordinated creditor who argues that it is unfair that its claim be separately classified and that no distribution will be paid to the subordinated creditor on account of the subordinated claim (unless the senior claim is first paid in full). Confirmation was proper. Contractual subordination is enforceable in bankruptcy. In the adversary proceeding, the Bankruptcy Court erred in granting summary judgment to Appellees and denying summary judgment to the Liquidating Agent.

c.    The Bankruptcy Court Erred in Refusing to Allow First Union to Give Up Its Distribution in Favor of a Class of Other Creditors.

An assignment by a senior creditor of a portion of its claim to a class of general unsecured creditors is in no way unfair to a subordinated creditor who receives no distribution under the terms of a plan. Appellees can point to no decisions to the contrary. The Plan in the case at bar provided that all Distribution amounts payable to or on account of the First Union Deficiency Claim and the Subordinated Claims were transferred and assigned to and for the benefit of the Holders of Unsecured Claims (Class 3). Plan, Article IV, I.2 at 19.

170220

Reduced to basic terms, the Plan (R. Tab No. 181) enforces the Subordination Agreements and, as part of the compromise, First Union transfers and assigns the distribution to which it would otherwise be entitled to and for the benefit of the holders of claims that fall in Class 3, the general unsecured class. The general unsecured class (Class 3) members are receiving a distribution to which they would be entitled based on allowed claim amount plus the distribution amount which First Union would have received, if First Union had maintained its right to participate as a general unsecured creditor and had not settled.[3] Nothing in the Bankruptcy Code prohibits a creditor from assigning its distribution to another class of creditors under these circumstances.  <u>Even in the absence of a subordination agreement</u>, there is nothing to prohibit a creditor from agreeing that part of its distribution should be paid to a different class of creditors.

In <u>In re Worldcom, Inc.</u>, 2003 WL 23861928 (Bankr. S.D.N.Y. 2003), the Court stated:

> <u>Creditors are generally free to do whatever they wish with the bankruptcy dividends they receive, including sharing them with other creditors</u>, so long as recoveries received under the Plan by other creditors are not impacted. <u>See</u> <u>Official Comm. of Unsecured Creditors v. Stern (In re SPM Mfg. Corp.)</u>, 984 F.2d 1305, 1313 (1st Cir.1993); <u>In re MCorp Fin., Inc.</u>, 160 B.R. 941 (S.D.Tex.1993); <u>In re</u>

---

[3] Contrary to the Bankruptcy Court's holding, this is not a matter of form over substance.  First Union does have a deficiency claim, and it assigned its right to a distribution on that deficiency claim to the non-subordinated unsecured creditors.

> Teligent, Inc., 282 B.R. 765 (Bankr.S.D.N.Y.2002); In re Nuclear Imaging, 270 B.R. 365 (Bankr.E.D.Pa.2001); In re Genesis Health Ventures, Inc., 266 B.R. 591 (Bankr.D.Del.2001); In re White Glove, Inc., 1998 WL 731611 (Bankr.E.D.Pa.1998); In re Parke Imperial Canton, Ltd., 1994 WL 842777 (Bankr.N.D.Ohio 1994).

In re Worldcom at p. *61.  In the Worldcom case, certain creditors were to receive the same treatment as other unsecured creditors but also receive additional value from contributions from the holders of claims in other classes.  Id. at *5 and *24-*25. The Court concluded that the enhanced value received by a certain class of creditors on account of contributions from other classes "does not constitute unfair discrimination."  Id. at *60. The give-up was upheld.

In In re Genesis Health Ventures, Inc., 266 B.R. 591 (Bankr.D.Del.2001) (a case relied on by the Worldcom case), the Court in confirming a plan approved give-ups from senior secured creditors in favor of unsecured creditors. The Court concluded that it was

> a permissible allocation by the secured creditors of a portion of the distribution to which they would otherwise be entitled, rather than unfair discrimination … by the proponents of the plan.

Genesis Health Ventures, 266 B.R. at 612. Again, the give-up was held not to run afoul of any rule of law.

In Official Comm. of Unsecured Creditors v. Stern (In re SPM Mfg. Corp.), 984 F.2d 1305, 1313 (1st Cir.1993) a secured lender holding a perfected, first

170220

security interest in all of the debtor's assets entered an agreement to give-up a portion of its lien proceeds to unsecured creditors. The Court of Appeals held that the bankruptcy court did not have the equitable power under 11 U.S.C. §105(a) to recharacterize the agreement and stop the give-up. Id.

The Worldcom and Genesis Health cases establish that give-ups are permissible under a plan. The SPM Mfg. case establishes that a bankruptcy court does not have equitable power to undo a validly entered agreement providing for a give-up. The case at bar is even more compelling since the give-up was approved in a confirmed plan, and the attack is post-confirmation. Accordingly, the Bankruptcy Court erred in refusing to enforce the give-up by First Union of its distribution in favor of the class of unsecured claims.

d.  The Bankruptcy Court Erred in Indicating that Wrongful Conduct by Appellees Would be Necessary in Order to Separately Classify and Subordinate the Appellees' Claims.

At the March 23, 2005 hearing the Bankruptcy Court appeared to indicate that some inequitable conduct by TSG and the other Appellees would have to be shown before it would be appropriate to separately classify and subordinate the claims of the Appellees. The Court stated: "I asked you at the last hearing is there some inequitable conduct, did his clients do something that harmed the debtor or harmed the creditors, and I got nothing in response, and it seems to me that the

41

only thing that's happened is, for whatever reason – I don't know the reason, but for whatever reason, the plan was set up to not give his clients any distribution…." Transcript at p. 23, lines 9-15. The Court also stated: "when these matters are sold – the assets are sold an a liquidating agent or a Chapter 11 trustee, what I would expect it to be is to gather the assets and distribute out to creditors, and if there's some reason – some reason that some creditor ought to be bounced out of the money, I'll hear it. You know, sometimes creditors do all kind of things that they should not – shouldn't share pro rata, but if they haven't done anything, I mean I just have a tough time seeing how you create this setup, and it seems it's created just to get them out of the money." Transcript at p. 25, lines 4-13.

While some sort of inequitable conduct may be necessary before a claim is subordinated under the principals of <u>equitable</u> subordination as set forth in 11 U.S.C. §510(c), the case at bar is not an <u>equitable</u> subordination case. This case involves <u>contractual</u> subordination. TSG and the other Appellees agreed by contract that they would receive no payment from the liquidation of the Debtor's assets in bankruptcy until "all Senior [First Union] Debt shall first be fully, finally, and irrevocably paid in full…." Note and Warrant Purchase Agreement (Ex. A to R. Tab No. 1) at Section 10.3. Subordination of their claims is therefore mandated by Section 510(a) of the Bankruptcy Code (not by Section 510(c)). <u>See</u> <u>also</u> <u>In re</u>

42

170220

<u>Southeast Banking Corp.</u>, 156 F.3d 1114, 1121 (11th Cir. 1998) ("The language of section 510(a) … directs courts to enforce subordination agreements to the extent that the agreements are enforceable under 'applicable nonbankruptcy law.'"). Further, as set forth earlier in this brief, it is entirely appropriate that subordinated noteholders be separately classified by a Chapter 11 plan and that they receive treatment that differs from that afforded to other creditors (who do not hold subordinated claims).

e.    <u>The Bankruptcy Court Erred in Indicating that the Appellees Would Have Been Entitled to a Distribution if this Bankruptcy Case Had Been Converted to Chapter 7</u>.

At the March 23, 2005 hearing the Bankruptcy Court appeared to indicate that TSG and the other Appellees would have received a distribution if the debtor's bankruptcy case had been converted to Chapter 7.  The Court stated: "I don't see how this was much different than a Chapter 7 process.  I really don't, because if I had a Chapter 7 Trustee right at that point, at the end of the sale, they would've probably just tried to shake some money loose, then when they shook it loose, would've put it with whatever else they had and just did a final report, and say here's the distribution, because it wouldn't have mattered to the Chapter 7 Trustee. He wouldn't have cared whether all the money was going to the unsecured

43

creditors – the unsecured creditors he picked, because, in this scenario, because [TSG and the other Appellees] was just like an unsecured creditor, too…." Transcript at p. 13, lines 8-19.

Appellant shows that, in a Chapter 7 case, a trustee would again not make any distribution to TSG and the other Appellees, because they contractually agreed that they are not entitled to any distribution unless and until First Union was paid in full. If a Chapter 7 Trustee made a distribution to TSG and thereby diluted or reduced the distribution made to the non-subordinated creditors, those creditors would have a claim that the trustee breached his duties. Accordingly, the Bankruptcy Court's reasoning in the case at bar is flawed. The Court appeared to reason that, since TSG and the other Appellees would have received a distribution in a Chapter 7 liquidation, they are likewise entitled to a distribution in this Chapter 11 case (since this Chapter 11 case resulted in a Plan of Liquidation). This is clear error. TSG would have received no distribution in a Chapter 7 case as long as the Chapter 7 trustee did his or her job properly and as long as First Union had not been paid in full. See, e.g. In re Southeast Banking Corp., 156 F.3d 1114 (11th Cir. 1998) (enforcing subordination agreements in a Chapter 7 case).

44

f.      The Bankruptcy Court Erred in "Re-Characterizing" the Settlement With First Union to Treat First Union as Fully Paid.

At the March 23, 2005 hearing the Bankruptcy Court indicated that: "No matter what the parties or their lawyers may call an agreement or transaction, courts are inclined to change the label and treatment to match what they see as the parties' true intention, risk retention, or economic reality." Transcript at p. 17, lines 19-23. The Court went on to state that "the Court has the inherent authority, if it furthers a bankruptcy cause, to look at the economic substance and re-label or re-characterize it." Transcript at p. 19, lines 11-13. The Court acknowledged that the plan indicates that First Union had a deficiency and that First Union had distribution rights (Transcript at p. 20, lines 10-11). The Court then indicated: "If I took those labels, the game is over…. But I don't think the Court is bound by the title people give it, and you have to look at the economic substance, and when I look at the economic substance, here's what I see. I see a creditor that has agreed to take less than its full amount…." Transcript at p. 20, lines 12-19.

The basis for the Court's conclusion that First Union was fully paid is that the settlement agreement provided that First Union could no longer be sued (Transcript at p. 21, lines 7-8), that First Union's remaining duties after settlement were to provide truthful evidence regarding the assignment (Id. at lines 12-13), that First Union could not be sued even if a subordination agreement were found to be

45                                                                          170220

unenforceable (Id. at pages 21-22), and that First Union then "walked away." (Transcript at p. 24, lines 1-2).

Appellant respectfully shows that the Bankruptcy Court was wrong to conclude that First Union was "fully paid" (Transcript at p. 24, line 1) merely because First Union agreed to take a lesser amount than First Union was otherwise entitled to by way of assigning some value to a different class of creditors. That First Union was permitted to "walk away" after settling cannot possibly form a basis for a conclusion that First Union was paid in full for purposes of interpreting the subordination provisions of the Note and Warrant Purchase Agreement. What could a creditor in First Union's position possibly do under these circumstances to preclude a finding that it had been fully paid? Since there were insufficient proceeds from the sale of the Debtor's assets to pay the First Union claim in full, it became clear that First Union would not be paid in full in this bankruptcy case. First Union agreed to give up a distribution (and thereby agreed to be paid even less) in consideration of a settlement and an agreement that First Union would not be sued. Of course, First Union would want to be able to "walk away" as a condition of settling. Any creditor in First Union's position would insist on such a term.

Also, it is not a matter of "form over substance" to conclude that First Union has not been fully paid; it is a matter of economic reality.  As a matter of reality, First Union has not been paid the full amount of its claim and would never be paid the full amount of its claim from the assets of the Film Fabricators bankruptcy estate.  It was clear error for the Bankruptcy Court to conclude: "It didn't cost them anything to say, okay, I agree to assign you my distribution rights, whatever those are."  Transcript at p. 24, lines 2-4.  The economic consequences of the compromise approved in the Plan are as follows:  As indicated in the Disclosure Statement, it was anticipated that the amount available for distribution to the Holders of Unsecured Claims would be $580,000.00.  Disclosure Statement, R. Tab No. 182, Article, X. E. at 22.  As further indicated in the Disclosure Statement, if First Union had kept its Deficiency Claim and not negotiated away its rights to obtain a distribution, then First Union would have been able to claim 74.41% of the amount available for distribution.  Disclosure Statement, R. Tab No. 182, Article, X. E at 22.  Under such circumstances, TSG would have  still received nothing since First Union would not have been paid in full.  It was clear error for the Bankruptcy Court to conclude that it did not cost First Union anything to give up its right to a distribution on its Deficiency Claim.

170220

The only statutory basis the Bankruptcy Court cited for its conclusion was 11 U.S.C. §105(a), which permits a court to issue any order that is necessary or appropriate to carry out the provisions of Title 11. See Transcript at p. 18, line 23 to p. 9, line 6. However, bankruptcy courts are not empowered in the name of equity to make wholesale substitution of underlying law controlling the validity of entitlements of creditors but are limited to what is provided in the Bankruptcy Code. Raleigh v. Illinois Dept. of Revenue, 530 U.S. 15, 24-25, 120 S.Ct. 1951, 1958 (2000). Section 105(a) does not empower a bankruptcy court to create substantive rights otherwise unavailable under the Code, and it does not provide a vehicle to expand the contractual obligations of parties. SPM Mfg., *supra* at 1311.

The Court erred in concluding that First Union was fully paid as a matter of "economic substance." The Plan and the Confirmation Order are controlling: First Union was allowed a deficiency claim of $1,890,073.37. That allowed claim of First Union will not be paid in full since there are insufficient assets. Since Appellees are contractually subordinated to First Union, Appellees are not entitled to a distribution.

## VI.    CONCLUSION

For the foregoing reasons, the Court should reverse the Judgment of the Bankruptcy Court and remand with directions that the Bankruptcy Court grant the

48

Liquidating Agent's Motion for Summary Judgment and dismiss the Complaint filed by the Appellees.

Respectfully submitted this 24th day of May, 2005.

LAMBERTH, CIFELLI, STOKES & STOUT, P.A.
Special Counsel for S. Gregory Hays, as Chapter 11 Trustee and Liquidating Agent for Film Fabricators, Appellant

By: /s/ J. Michael Lamberth
J. Michael Lamberth
Georgia Bar No. 431975

By: /s/ William D. Matthews
William D. Matthews
Georgia Bar No. 470865

3343 Peachtree Road, N.E.
East Tower, Suite 550
Atlanta, Georgia 30326-1022
(404) 262-7373 (Telephone)
(404) 262-9911 (Facsimile)

49

170220

## **CERTIFICATION**

Pursuant to District Court Local Rule 7.1D, counsel for Appellant certifies that this Brief of Appellant has been prepared with one of the font and point selections (*i.e.* Times New Roman, 14 point) approved by the District Court in Local Rule 5.1B.

 /s/ J. Michael Lamberth 
J. Michael Lamberth

170220

## CERTIFICATE OF SERVICE

This is to certify that I have this day served true and correct copies of the

foregoing *Brief of Appellant* on the parties listed below via the United States

regular mail, postage prepaid, addressed as follows:

Paul Burke O'Hearn
Erich N. Durlacher
Gregory F. Harley
Burr & Forman LLP
171 Seventeenth Street N.W., Suite 1100
Atlanta, GA 30363
Attorneys for Appellees/Plaintiffs

J. Michael Booe
Kennedy Covington Lobdell & Hickman, L.L.P.
Hearst Tower, 47th Floor
214 North Tryon Street
Charlotte, NC 28202

Office of the United States Trustee
75 Spring Street, S.W.
Suite 362
Atlanta, Georgia 30303

This 24th day of May, 2005.

/s/ J. Michael Lamberth
J. Michael Lamberth

170220